*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* CHAMBERS/POLINO, Minors.

UNPUBLISHED
May 26, 2022

Nos. 359088; 359089
St. Joseph Circuit Court
Family Division
LC No. 2020-000358-NA

Before: GLEICHER, C.J., and RONAYNE KRAUSE and BOONSTRA, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent-mother and respondent-father appeal by right the trial court's order terminating their parental rights to the minor children, JDP and CC, under MCL 712A.19b(3)(g) (failure to provide proper care and custody) and (j) (reasonable likelihood that child will be harmed if returned to parent). We affirm.

## I. FACTS

Respondents are the parents of JDP and CC. On June 12, 2020, the Department of Health and Human Services (DHHS) filed a petition requesting that the trial court remove the children from respondents' care. The DHHS alleged that the Michigan State Police conducted an unrelated search of respondents' home on June 10, 2020, and found JDP, who was 3 years old at the time, and CC, who was one year old, alone in the basement after officers had been searching the house for approximately 30 minutes. Officers also found drugs and paraphernalia in the basement, including drugs and drug residue near the children. Children's protective services workers visited the home on June 11, 2020, and found JDP alone in the basement. The DHHS alleged that the basement was in a "deplorable condition with garbage and dirty diapers strewn about." Further,

---

[1] *In re Chambers/Polino Minors*, unpublished order of the Court of Appeals, entered November 2, 2021 (Docket Nos. 359088 and 359089).

there were several dogs in the house and dog feces and urine throughout, along with broken glass and trash, and respondents had a history of domestic violence.[2]

The trial court ordered the children's removal and held a preliminary hearing. Michele Gilpin, of the DHHS, testified about what the officers found and the home conditions that she saw when she visited the following day. The referee agreed to adjourn the hearing in order to locate father, who was not present. However, the referee authorized the petition and approved the temporary removal of the children into foster care. The referee stated that the DHHS had the authority to suspend mother's parenting time until she had three consecutive, clean drug screens. However, if the only substance for which she tested positive was marijuana, the DHHS would need to demonstrate that mother's use of marijuana posed a risk to the children. The referee also suspended father's parenting time until the next hearing, on the basis of his history of domestic violence and his unknown whereabouts.

At the next hearing, held on June 25, 2020, using remote video conferencing, mother admitted to some of the allegations in the petition, specifically that she lived with the children, that she used methamphetamine while living with the children, and that her use of methamphetamine was bad for the children. Father appeared at the hearing, and father's attorney requested time to speak with father because they had not yet spoken. After they met, father's attorney requested another hearing because he and father needed more time to discuss the allegations and his rights. The referee suggested July 16, to which father objected because that date was "almost a month out" and he "want[ed] to handle this matter as quick as possible." The referee suggested July 9, and father expressly stated, "[s]ounds good to me." Father's attorney stated that father wanted to set up the drug screens as soon as possible so that he could start parenting time. Joanna McKinney, of the DHHS, expressed concern that father had been living in the basement and that the drugs belonged to him. McKinney stated that father "[was] set up for drug screens at three times a week and he got that information yesterday." The referee told father that his parenting time could begin once he had a clean drug screen, and father stated that it was "not a problem." The referee told father to contact McKinney. However, father did not appear for the July 9, 2020 hearing, and father's attorney explained that he had been unable to contact father since the June 25 hearing.

_____

[2] The petition improperly contained only references to "domestic violence between" respondents and thus failed to specify whether either parent was a perpetrator, a victim, or both. See *In re Jackish/Stamm-Jackish Minors*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 357001), slip op at pp 4-5. Nevertheless, our review of the confidential file reveals that at some point each respondent entered pleas of guilty to misdemeanor domestic violence charges, and numerous other hints throughout the record further suggest that mother and father were both perpetrators and victims. Although parental rights may not be terminated because a parent is a victim of domestic violence, it is proper to consider a parent's commission of domestic violence and other conduct committed by the parent that directly harms the child or exposes the child to harm. *Id*. In any event, the trial court did not cite domestic violence as a basis for terminating either respondent's parental rights, so any error in failing to specify whether they were victims or perpetrators is effectively harmless.

-2-

The trial court held an adjudicatory trial for father on September 11, 2020. Father was incarcerated at the time, but he participated remotely, and his attorney advised the court that they had discussed the petition. Detective Trooper Jason Roskam, of the Michigan State Police, testified that he searched the home in June 2020, pursuant to a search warrant arising out of an unrelated investigation. When he was there, JDP, CC, and three adult relatives were at the home, and the children were found unsupervised in the basement along with drugs and paraphernalia. Detective Roskam explained that there were plastic baggies with methamphetamine residue, pills, a glass pipe, and marijuana remnants in the basement with the children. Further, other rooms in the house were "cluttered," and there were approximately fifty bottles of urine in an upstairs bedroom. Detective Roskam opined that most, if not all, of the drugs and drug paraphernalia would have been accessible to the children. It appeared to him that the children were living in the basement. Furthermore, he observed some formal paperwork in the basement with father's name on it, and he observed father at the residence numerous times during surveillance operations.

Mother's grandmother, who owned the residence, testified that both respondents were living there at the time of the June 2020 search, but father also stayed at a different residence some of the time. Mother's grandmother denied knowing about the drugs. Father testified that he was "bouncing" between homes at the time of the search because approximately one month earlier, he and mother had been fighting, and mother's grandmother called the police, who made father leave the house. However, father continued to return every day in order to be with the children. Father testified that he provided diapers, wipes, formula, and shoes for the children, and he watched them, changed them, and cooked breakfast for them. Father testified that he and mother yelled and broke things during their arguments, but they did not hit each other. Father denied knowing about the drugs in the home, and although he admitted there were a lot of clothes in the basement because they were being washed in preparation to donate them, he insisted the home was always kept clean and "was never a feces-filled home with all type." Father explained that the urine bottles belonged to one of the household residents who had "a little mental problem," but he insisted that the children had clean playrooms and that there were ample beds in the house for everyone. Gilpin opined that it was possible some of the broken glass and items strewn on the floor during the June 11 visit could have been due to a careless search by the police the previous day, but she questioned why they had not been cleaned up in the meantime, and she pointed out that dog feces and dirty diapers were also scattered throughout the house.

The trial court found that father must have known about the conditions of the home and that it had grounds to take jurisdiction of the children. Chelsea Meyer, of the DHHS, testified that the children were currently placed in a foster home, and although two relatives had reached out regarding placement, one of those relatives was not an option and the other was seriously concerning. She also noted that contact with father had "been very difficult." The trial court ordered that father participate in services that were available to him while he was in jail. The trial court suspended father's parenting time while he was in jail and ordered that the visits be supervised once he was released and had a negative drug screen. The trial court explained that it was "impossible" to return the children to him while he was incarcerated. The trial court told father about his rights to appeal and told him to contact Meyer and his attorney when he was released from jail.

By September 24, 2020, mother had made no effort to provide drug screens, she failed to show up to three scheduled Infant Mental Health sessions and was fifteen minutes late to a fourth.

Mother had scheduled two appointments with Meyer only to fail to appear for either, continued to deny that the children were in the basement or that she was under the influence, and was generally difficult to contact. Furthermore, the children displayed "attachment disturbances with their mother;" one child was unaffected when mother left a trauma assessment, and the other child avoided interacting with mother. Both children had serious behavioral issues that mother appeared not to recognize. Father remained incarcerated, but he had reported that he was living in a motel and self-employed doing carpentry work, although he had not provided any evidence of income. Meyer testified that father also proved difficult to contact and had made no effort to provide drug screens prior to his incarceration.

At some point in October, mother bailed father out of jail. According to Meyer, by December 17, 2020, mother had provided three drug screens; all three were positive for THC, methamphetamine, and amphetamine, and one was also positive for norhydrocodone and hydrocodone. Mother failed to appear at a session to begin services with community mental health and failed to appear for numerous other appointments. Respondents appeared for one joint session, but mother then requested separate sessions because father was seeing someone else. Mother was refused admission to a rehabilitation facility because she denied using any substances other than marijuana and did not believe her use of substances was negatively impacting her life. Mother reported being self-employed doing yard work and having a vehicle that "does need work," but she had not offered proof of either. Meyer had not been able to contact father, and father never tried to contact her when he was released from jail. Father had made no effort to drug screen, and mother had reported that father moved into the home of a known heroin user upon his release from jail. Father was present at the hearing, and Meyer agreed to meet with him following the hearing. She noted that the children "are considered quite high needs" and were "severely, severely behind in almost every category evaluated." One of the children also likely had a rare disease with numerous serious complications that would require lifelong care for the symptoms. Nevertheless, the children were doing well in their foster placement, although they still had "a very, very long way to go."

At a hearing on March 11, 2021, Meyer reported that she did not know where respondents were living, and she had only one contact with mother when mother asked Meyer to persuade her probation officer to "drop the 90 days." Mother otherwise had no contact with anyone, and she provided only one drug screen, which was positive for THC, methamphetamine, and amphetamine. Meyer believed there were warrants out for mother's arrest. Meyer met with father following the previous hearing, during which he gave her his new phone number, and she gave him her contact information and all the information he needed to begin drug screening. However, she never heard from father thereafter, father had not participated in any drug screens, and she made numerous efforts to contact him, to no avail. Meyer explained that the children had "extreme behavioral issues," and one of the children also had "really extreme medical care needs as well." She opined that they would need "really attuned" caregivers with the skills to meet the children's needs.

At the June 10, 2021 permanency planning hearing, Meyer testified that she had not had any contact with mother that reporting period. Mother had completed one drug screen in May 2021, which was positive for only THC. However, mother admitted during an intake with community mental health in May 2021, that she had used methamphetamine that month. Mother was supposed to be testing three times a week, but she had only tested once within the preceding three months. Meyer had also not had any contact with father. Someone responded to the number

she had for father, stating that the number did not belong to father, and she had only recently learned that father was back in jail. Father's attorney explained that father had been incarcerated since April 2021, and father reported engaging in some services at the jail. The trial court ordered the DHHS to initiate termination proceedings, and the DHHS filed a termination petition.

The termination hearing occurred in September 2021, and both respondents were present for that hearing. Meyer testified that she had been the foster-care worker since the children were removed in June 2020. At that time, mother's barriers to reunification included housing, employment, transportation, substance abuse, parenting skills, and her relationship with father. Meyer had only been able to meet with mother two times throughout the entire case. Mother only completed five dug screens throughout the case, all of which were positive. Mother did not have appropriate housing or employment, and she did not complete any services. Because mother never provided three clean consecutive drug screens, she never had any parenting time during the pendency of the case, even though Meyer attempted to explain to mother the conditions for seeing the children. Meyer testified that father's barriers to reunification included housing, employment, transportation, domestic violence with mother, substance abuse, and parenting skills. Father had been in jail since April 2021, but he did not complete any services and had minimal communication with Meyer before going to jail. Father never participated in any drug screens, and therefore he also never had any parenting time, although Meyer did recognize that father was participating in a 12-step program in jail. Meyer opined that the children would need a caregiver with "pretty exceptional parenting skills," and neither parent had demonstrated even basic parenting skills, despite urging them to work with services to help them develop those skills.

Father testified that he had stable housing at another address for two or three years and that he owned a business doing carpentry, landscaping, and demolition, among other services. Father testified that he had been incarcerated for seven out of the fifteen months the case had been pending, during which he had availed himself of everything the jail offered, including a 12-step program, a relapse prevention program, two bible studies, meetings with a chaplain, and leading a prayer circle. Father explained that he had also been badly injured in a car accident that left him incoherent and unresponsive for three months. Father offered several reasons why he had not engaged during the remaining five months, but he admitted that none of those reasons were excuses. Father agreed that he had an addiction problem, but he insisted that it was "in the past now" and that his "main addiction problem has been stress and lottery tickets." Father protested that "methamphetamine was not [his] drug of choice." Father testified that he had been "coerced" into pleading guilty to possession with intent to deliver methamphetamines in June 2021, and he had moved the trial court to withdraw his plea. He stated that he was "pretty sure [the children] know who daddy is."

The trial court found clear and convincing evidence that grounds for termination of mother's and father's parental rights existed under MCL 712A.19b(3)(g) and (j). Further, the trial court found that termination was in the children's best interests and terminated respondents' parental rights. Mother and father now appeal.

## II. STANDARDS OF REVIEW

"A court may terminate a respondent's parental rights if one or more of the statutory grounds for termination listed in MCL 712A.19b(3) have been proven by clear and convincing

evidence." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). We review for clear error the trial court's determination that at least one statutory ground for termination was proven by clear and convincing evidence. *Id*. Clear error exists when this Court is left with a definite and firm conviction that the trial court made a mistake. *In re Terry*, 240 Mich App 14, 22; 610 NW2d 563 (2000).

In addition, "[o]nce a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App at 40. The trial court should consider all of the available evidence and "a wide variety of factors" in making that determination, including the bond between the child and the parent, the parent's skills and abilities at parenting, the child's needs, the parent's compliance with a case service plan and visitation history with the child, how well the child has done in foster care, and any advantages the foster care home may have over the parent's home. *In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014). The trial court's best-interests finding must be by a preponderance of the evidence, and our review is again for clear error. *Id*. at 713. At the best-interests stage, the focus is on the child rather than the parent. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013).

"Parents have a significant interest in the companionship, care, custody, and management of their children, and the interest is an element of liberty protected by due process." *In re JK*, 468 Mich 202, 210; 661 NW2d 216 (2003). Nevertheless, that interest is "not absolute." *In re Sanders*, 495 Mich 394, 409; 852 NW2d 524 (2013). This Court reviews de novo whether child protective proceedings complied with procedural due process. *Id*. at 403-404. "Procedural due process requires notice and a meaningful opportunity to be heard before an impartial decision-maker," and substantive due process prohibits "the arbitrary deprivation of liberty or property interests." *In re TK*, 306 Mich App 698, 706; 859 NW2d 208 (2014). "The interpretation and application of statutes and court rules are also reviewed de novo." *In re Sanders*, 495 Mich at 404. However, this Court reviews for plain error unpreserved claims of constitutional error. *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011). In order to establish plain error, a party must show that an error occurred, the error was clear or obvious, and the error affected the party's substantial rights. *Id*. "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App 1, 9; 761 NW2d 253 (2008).

## III. RESPONDENT-MOTHER

Mother argues first that the trial court erred by finding that termination was in the children's best interests. Specifically, mother argues that the trial court failed to consider the "wide variety of factors" required by *In re White* and by failing to make an adequate record of its findings as required by MCR 3.977(I). We disagree.

### A. GROUNDS FOR TERMINATION

As an initial matter, mother does not challenge the trial court's determination that statutory grounds for termination had been adequately proven, so we will assume the trial court's statutory-grounds findings were correct. See *In re JS and SM*, 231 Mich App 92, 98-99; 585 NW2d 326 (1998), overruled in part on other grounds *In re Trejo Minors*, 462 Mich 341, 353; 612 NW2d 407 (2000).

## B. "WIDE VARIETY OF FACTORS"

Although this Court held that the trial court "should consider a wide variety of factors" when making its determination of the child's best interests, this Court never mandated which factors the trial court must consider; rather, this Court only enumerated a variety of possibilities. *In re White*, 303 Mich App at 713-714. Furthermore, this Court held that the trial court is only required to expressly state individual findings for each child if the interests of the children significantly differ. *Id.* at 715-716. Finally, to the extent the trial court's best-interests findings are based on matters already discussed regarding the statutory grounds for termination, we do not believe the trial court must go to great lengths to repeat itself.

The trial court recognized that the case had been ongoing for fifteen months, during which respondents had been repeatedly told what they needed to do, and respondents simply made little to no effort. The trial court opined that

> It would be hard for me to imagine parents doing less in 15 months than both of these parents have done in this case. They have done nothing to get their children back. They've not even had visitation because they don't get three consecutive drug screens in.

Mother had provided only five drug screens, four of which were positive for methamphetamine despite her admission at the beginning of the case that using methamphetamine was bad for the children. Respondents made almost no effort to contact agency workers, and mother made little to no effort to engage in the services she would need to develop adequate parenting skills for the children. The children had significant mental health needs, and one of them also had significant physical health needs; those needs were being met by the foster family, but respondents lacked even basic parenting skills. The trial court recognized that a relative placement was under investigation, but because the relative was in Florida, the investigation was going to take a long time. The trial court found that if there ever was a bond between respondents and the children, it no longer existed after fifteen months of no contact. It concluded that the children needed stability and permanency that neither respondent could provide. The trial court recognized that the children were different ages and that only one of them had a severe physical medical disability.

In short, the trial court did consider essentially all of the factors discussed in *In re White*; it certainly considered all of the factors that held any relevance. Furthermore, mother does not identify a single factor that weighs against termination being in the children's best interests. Instead, mother notes that JDP's medical needs were more significant than CC's medical needs, but the trial court recognized that disparity, and mother does not argue that she had the ability to care for either child's needs. Therefore, the trial court did not err by finding that termination was in the children's best interests.

## C. ADEQUATE RECORD OF FINDINGS

MCL 712A.19b(1) requires a trial court to "state on the record or in writing its findings of fact and conclusions of law with respect to whether or not parental rights should be terminated." Further, MCR 3.977(I)(1) provides that "[b]rief, definite, and pertinent findings and conclusions on contested matters are sufficient." The phrase, "brief, definite, and pertinent findings and

conclusions" obligates the trial court to make a record from which the factual basis of its conclusion can be meaningfully gleaned; it does not require an exhaustive discourse. See *In re Baham*, 331 Mich App 737, 752-753; 954 NW2d 529 (2020). As discussed above, the trial court recited a wide variety of reasons for its best-interests determination. The trial court also stated that it considered opinions from Meyer, the lawyer-guardian ad litem, and an Infant Mental Health worker. The trial court specifically noted that the factors it discussed at that point were the important factors to consider, but it had also already discussed an abundance of information about the children during the statutory grounds phase of its explanation, indicating that the trial court was well aware of the pertinent facts in the case.

## IV. RESPONDENT-FATHER

Father argues that the trial court erred in finding statutory grounds to terminate his parental rights, failed to hold a proper preliminary hearing, and erred in suspending his parenting time. We disagree.

## A. STATUTORY GROUNDS FOR TERMINATION

The trial court terminated father's parental rights to CC and JDP pursuant to MCL 712A.19b(3)(g) and (j), which provide:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> * * *
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

If this Court concludes that the trial court did not clearly err by finding one statutory ground for termination, this Court does not need to address any other grounds. *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).

Father's brief on appeal is not entirely clear, but it appears that he challenges only the trial court's findings under MCL 712A.19b(3)(g). To the extent he does not challenge the trial court's findings under MCL 712A.19b(3)(j), we may consider the trial court's findings correct. *In re JS and SM*, 231 Mich App at 98-99. Because only one ground for termination is required, any error by the trial court in its findings under MCL 712A.19b(3)(g) would be irrelevant. Nevertheless, we do not find clear error in the trial court's findings.

We are concerned that the trial court's stated belief that the only reason why someone would not have a job is if they did not want a job, but father did claim to have an income, and it would be appropriate to hold him to that claim. Therefore, it was not clearly erroneous for the trial court to deem respondent financially able to provide care and custody for the children. The evidence clearly established that the children had exceptionally grave needs that would be difficult even for a person with average parenting skills to provide. Despite the trial court's entirely proper finding that father could not have been ignorant of the drugs and other dangerous and unhealthy conditions in the house, and despite his guilty plea for a methamphetamine-related criminal offense, father repeatedly downplayed his involvement with methamphetamine and made no effort to provide drug screens or engage in services during the periods he was not incarcerated. Father makes much of his improved attitude while in jail. Although commendable, his sobriety was essentially involuntary, and his engagement in services while incarcerated and without anywhere else to go does not establish that father would maintain that participation or sobriety once released. Father's claim that he "undisputedly" recovered from his addictions in 2017 and 2018 simply defies belief, especially because the issues that gave rise to this case occurred after that supposed recovery.

Ultimately, respondent avoided taking responsibility while attempting to portray himself as someone who had few meaningful challenges, despite the evidence to the contrary; and his failure even to try to participate in services while out of jail shows that there was no reasonable expectation that he would be capable of providing proper care and custody for the children within a reasonable time. The fact that respondent abdicated any responsibility despite repeatedly acknowledging his obligations and stating that they would not be a problem further shows that father would be incapable of providing the intensive and stable care the children would need. Therefore, the trial court did not err by terminating father's parental rights.

## B. PRELIMINARY HEARING

A trial court must hold a preliminary hearing within 24 hours of taking a child into protective custody. MCR 3.965(A)(1). MCR 3.965(B) governs the procedure of preliminary hearings in child welfare proceedings. At the hearing, the trial court must determine whether "to authorize the filing of the petition and, if authorized," the placement of the child. MCR 3.965(B)(12), (13). MCR 3.965(C)(1) provides that a respondent "shall be given an opportunity to cross-examine witnesses, subpoena witnesses, and offer proofs to counter the admitted evidence" when a trial court does not release a child pursuant to MCR 3.965(B).

The trial court held a preliminary hearing on June 12, 2020, at which father was not present, and nobody knew where father was. However, respondent's attorney was present, and his attorney made full use of the opportunity to cross-examine Gilpin, the only witness who testified. The referee adjourned the hearing to June 25 in order to locate father. Nevertheless, it authorized the petition following testimony from Gilpin, opining that the conditions of the home even aside from the drugs posed a serious risk to the physical and mental well-being of the children, and "[a]ny parent under those circumstances should have had a well-founded suspicion that there was drug activity going on in the home and should have taken steps to prevent the children from having access to drugs that could very well have seriously harmed them." The referee recommended

suspension of father's parenting time on the basis of domestic violence concerns,[3] that father's location was unknown, and the referee's need to know more about him before putting the DHHS "in a position of having to supervise parenting time." That suspension was only until the June 25 continued hearing.

Father contends that the trial court never held the continued hearing, but in fact, a hearing *was* held on June 25, 2020, as scheduled, and father appeared at that hearing. After the referee took an admission from mother, father's attorney asked for a further adjournment but also asked to be heard regarding parenting time. Father expressly agreed to a date for the next hearing, and the referee promised father that he could "have supervised parenting time as arranged by the agency once they get a clean drug test from you." Father stated, "it's not a problem," and asked how to set up the parenting time, to which the referee explained that he only needed to contact the agency, which would "set it up for you." Furthermore, mother's attorney also explained during that hearing that a relative was interested in placement. Father and his attorney were present for these conversations regarding parenting time and placement, and there is no indication that father was unable to address the topics before the trial court adjourned the hearing at father's request.

However, father did not attend the July 2020 hearing despite the fact that he obviously knew about it, and his attorney stated that he had not been able to contact father since the previous hearing. Because father was on notice, the trial court could proceed without him. See MCR 3.965(B)(1); *In re Rood*, 483 Mich 73, 107; 763 NW2d 587 (2009). Instead, the referee scheduled a trial date at the suggestion of father's attorney, in order to move the case forward, and the referee told father's attorney to contact the trial court if father wanted a hearing date before the trial.

The trial court held father's adjudicatory hearing on September 11, 2020, at which time father was present from jail. Father argues that the trial court did not advise him of his rights because it did not hold a preliminary hearing. However, as noted, the trial court had the ability to hold the preliminary hearing in July 2020, and father was not present in order to hear those rights. Regardless, the trial court then held an adjudication hearing, at which father was present and testified, and he does not explain what different information he would have provided at another preliminary hearing when he had the opportunity to attend two preliminary hearings in June 2020, and one in July 2020. Father also argues that he was not advised of his right to appeal the order of disposition, but after father's adjudication, the trial court informed father of his right to appeal and that he might be barred from appealing jurisdiction if his rights were ultimately terminated. Further, the trial court mailed father an advice of rights form. Therefore, the trial court did not fail to provide an opportunity for father to address the allegations, placement, and parenting time.

## C. SUSPENSION OF PARENTING TIME

MCR 3.965(C)(7)(a) provides that:

---

[3] As noted, the petition improperly failed to articulate whether father was a perpetrator or a victim, but testimony at the preliminary hearing indicated that both respondents had been charged with disturbing the peace at one point, and because the evidence eventually established that he was a perpetrator, this error ultimately proved harmless. See footnote 2.

Unless the court suspends parenting time pursuant to MCL 712A.19b(4), or unless the child has a guardian or legal custodian, the court must permit each parent frequent parenting time with a child in placement unless parenting time, even if supervised, may be harmful to the child.

Further, MCL 712A.13a(13) provides, in relevant part, that:

If a juvenile is removed from the parent's custody at any time, the court shall permit the juvenile's parent to have regular and frequent parenting time with the juvenile. Parenting time between the juvenile and his or her parent shall not be less than 1 time every 7 days unless the court determines either that exigent circumstances require less frequent parenting time or that parenting time, even if supervised, may be harmful to the juvenile's life, physical health, or mental well-being. If the court determines that parenting time, even if supervised, may be harmful to the juvenile's life, physical health, or mental well-being, the court may suspend parenting time until the risk of harm no longer exists.

Father argues that the trial court never made the requisite determinations of harm until almost a year after the preliminary hearing. We disagree.

The court rule and the statute both require a determination that parenting time *may* be harmful to the child, not that parenting time *would* be harmful to the child. Furthermore, "[t]he rule is well established that courts speak through their judgments and decrees, not their oral statements or written opinions." *Tiedman v Tiedman*, 400 Mich 571, 576; 255 NW2d 632 (1977). We might have hoped for the referee to make a fuller articulation on the record at the preliminary hearing regarding suspension of father's parenting time. However, the trial court entered a written order following that hearing stating that it was contrary to the welfare of the children to remain in the home because of the deplorable and unhealthy conditions of the house, the drugs and drug paraphernalia within reach of the children, and the "history of domestic violence, substance abuse, and instability." Clearly, "contrary to the welfare of the children" is no more than a particular way of expressing a determination that the children would be at a risk of harm. The written order further provided that "[c]ustody of the child(ren) with the parent/guardian/legal custodian presents a substantial risk of harm to the child(ren)'s life, physical health, or mental well-being" and "[n]o provision of service or other arrangement except removal of the child(ren) is reasonably available to adequately safeguard the child(ren) from the risk of harm to the child(ren)'s life, physical health, or well-being." Contrary to father's argument, the trial court unambiguously *did* make an express determination that parenting time with father might be harmful to the children.

Furthermore, the trial court's determination was clearly warranted. The evidence available to the trial court at that time was that father had been living in the house with the children until only a day or two before their removal, the children were living in appallingly unhealthy and unsafe conditions that could not have arisen since father's departure, father had an ongoing history of engaging in domestic violence and had no other suitable housing, father was not providing for the children, and even some family members had tried to contact father only for father to hang up on them. Although the referee only explicitly mentioned father's domestic violence and unknown whereabouts, the referee also stated that "any parent" should have realized that the children were in danger of accessing drugs and taken steps to prevent them from doing so. We conclude that the

referee's articulation of the danger posed to the children by parenting time with father was adequately articulated, and the trial court's determination that parenting time may harm the children was amply supported.

Because the trial court did not err in suspending father's parenting time, we need not consider defendant's argument that the trial court could not condition his parenting time upon providing clean drug screens. Nevertheless, we find disingenuous his argument that he would have somehow been "more committed to reunification" if he had been granted parenting time at the outset. The evidence indicates that father deliberately made himself difficult to contact from the outset, even by family members. Furthermore, father repeatedly acknowledged his obligations, indicated that they would not be a problem, and then proceeded to ignore them entirely. Even if the court erred, which it did not, any such error would not require reversal because it did not affect the outcome of the proceedings. See *In re Utrera*, 281 Mich App at 9.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Amy Ronayne Krause
/s/ Mark T. Boonstra

-12-